# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**DEMETRIUS M. BOYD,**
    **Plaintiff,**

v.                                                                           Case No. 17-C-423

**TRACY JOHNSON,** *et al.***,**
    **Defendants.**

## ORDER

Plaintiff Demetrius Boyd, a Wisconsin state prisoner who is representing himself, filed a complaint under 42 U.S.C. § 1983, alleging that defendants violated his civil rights at the Wisconsin Secure Program Facility ("WSPF"). Docket Nos. 1 and 25. I screened the complaint on August 15, 2017 and allowed plaintiff to proceed with three claims: (1) an Eighth Amendment claim that Dan Suthers and Laverne Wallace showed deliberate indifference towards plaintiff's suicide attempt and related medical needs, (2) an Eighth Amendment claim that Michael Fern used excessive force when he sprayed plaintiff with a chemical gas in the hospital parking lot, and (3) an Eighth Amendment claim that Stacey Hoem and Maria Lemieux exposed plaintiff to unsanitary conditions of confinement while he was placed in Clinical Observation. Docket No. 27 at 4.

Plaintiff filed a motion for partial summary judgment on October 12, 2017. Docket No. 36. Defendants filed a motion for summary judgment on March 19, 2018. Docket No. 49. For the reasons discussed below, I will deny plaintiff's motion for partial summary judgment, grant defendants' motion for summary judgment, and will dismiss the case.

## I. THE PARTIES CROSS-MOTIONS FOR SUMMARY JUDGMENT

### a. Facts[1]

At the time relevant to this matter, plaintiff was an inmate at WSPF. Docket No. 52, ¶¶ 1-2. Defendants were Department of Corrections ("DOC") employees who worked at WSPF: Dan Suthers and Michael Fern were Correctional Officers; Laverne Wallace was a Correctional Sergeant; Stacey Hoem was a psychologist; and Maria Lemieux was a psychological associate. *Id.*, ¶ 3.

On March 8, 2016, plaintiff was housed in restricted housing in Alpha Unit. *Id.*, ¶ 4. At around 10:35 p.m., plaintiff used his intercom to ask to speak to a supervisor. *Id.*, ¶ 5. The parties have slightly different descriptions of what was said during the conversation.

According to Suthers, he responded to plaintiff's intercom request by asking why plaintiff wanted to speak to a supervisor. Id., ¶ 6. Plaintiff stated that he wanted to go to Clinical Observation.[2] *Id.* Suthers asked plaintiff if he was going to harm himself and plaintiff stated that he had already consumed 60 Ibuprofen pills. *Id.*, ¶ 8. Suthers was located in the Sergeant's Station at that time and he looked at plaintiff's cell through the camera. *Id.*, ¶¶ 10-11, 20. Suthers then said that he would call a supervisor. *Id.* According to Suthers, he then saw plaintiff go to the back of his cell and tie one side of a bedsheet

---

[1] I take facts from defendant's proposed findings of fact (Docket No. 52), plaintiff's "declaration in support of plaintiff's motion for partial summary judgment" (Docket No. 36 at 1-8), and plaintiff's sworn complaints (Docket Nos. 1 and 25), which I construe as an affidavit at the summary judgment stage. *Ford v. Wilson,* 90 F.3d 245, 246-47 (7th Cir. 1996).

[2] Clinical observation is used to prevent inmates from harming themselves. Docket No. 52, ¶ 7. Prison staff remove any property that an inmate can use to injure himself and the items are re-introduced as the inmate's behavior and emotional stability improves and the risk of harm decreases. *Id.*

to the shower head and the other around his neck. *Id.*, ¶ 12. Suthers then requested help by calling Captain Hanfeld, two other officers who were already in Alpha Unit, and the "Control Center."³ *Id.*, ¶¶ 15-17.

According to plaintiff, Suthers "took a few moments" to answer the intercom. Docket No. 36 at 3, ¶ 8. Plaintiff explains that he then asked Suthers to look at him though the camera, and according to plaintiff, he "held up medications in [his] possession and warned Sgt. Suthers of [his] willingness to take all the medication in [his] possession should [Suthers] fail to follow protocol and contact the shift supervisor." *Id.* Plaintiff states that Suthers "continued to ignore [him] by simply not answering the intercom." *Id.* at 4, ¶ 9. Plaintiff called a few more times and stood directly in front of the camera. *Id.* at 4, ¶ 10. He also called out to other inmates who could hear him. *Id.* When plaintiff's conduct failed to get Suthers' "undivided attention," plaintiff states he consumed all of the medication in his possession, which was over 60 Ibuprofen pills. *Id.* Once plaintiff consumed the pills, he states that he tied one end of a bedsheet around his neck and the other around the shower head. *Id.* at 4, ¶ 11.

Captain Hanfeld and three support unit officers (including Feran) responded to Suthers' call and went to plaintiff's cell. Docket No. 52, ¶ 18. Hanfeld told plaintiff to remove the bedsheet from around his neck; plaintiff complied. *Id.*, ¶ 21. The other officers

---

³ Suthers explains that when an inmate shows suicidal tendencies or takes pills, prison procedure is for the officer to call a Captain. Docket No. 52, ¶¶ 13-14. If the inmate has already taken the pills, the Captain calls the Psychological Services Unit ("PSU") and the Health Services Unit ("HSU") for instructions on what to do next. *Id.*, ¶14. If the inmate has threatened harm, the Captain goes to the inmate's cell to talk to the inmate. *Id.*, ¶ 13. The Captain then contacts PSU and HSU only if necessary. *Id.*

restrained plaintiff and took him to the Alpha Unit strip-cage. *Id.*, ¶ 22. Hanfeld then contacted HSU and plaintiff was taken to Gunderson Boscobel Area Hospital. *Id.*, ¶ 24. Suthers watched the entire interaction though the cell camera. *Id.*, ¶¶ 20, 23. He explains that he could not leave the Sergeant's Station until properly relieved by another officer. *Id.*, ¶ 20. Suthers had no further involvement in this case.

Feran and one other officer transported plaintiff to the hospital, and they arrived around 11:34 p.m. (about an hour after plaintiff first called Suthers through the intercom). *Id.*, ¶¶ 25-26. Plaintiff agreed to give a urine sample so the hospital could properly evaluate his condition. *Id.*, ¶¶ 28-29. Although plaintiff initially agreed to give a urine sample, once he finished providing the sample, he threatened to drink his own urine. *Id.*, ¶ 29. Feran grabbed the cup; the other officer grabbed plaintiff's arm; and after several orders, plaintiff let go of the urine sample. *Id.*, ¶ 30.

Feran states that plaintiff was erratic, loud, and disruptive during the entire trip to the hospital. *Id.*, ¶ 27. Hospital records also describe plaintiff as non-compliant, manipulative, and inappropriate. *Id.*, ¶¶ 34-36; *see also* Docket No. 55-1 at 12, 14, 16-17. Plaintiff's behavior prompted a request for a third WSPF correctional officer to come to the hospital with a Taser. *Id*, ¶¶ 31-32. Boscobel Police were also asked to come to the hospital. *Id.*, ¶ 60. Plaintiff admits that more officers arrived on the scene but he states that it was caused by "paranoia…along with a willingness to over react." Docket No. 36 at 5, ¶ 13.

Plaintiff's urine analysis showed that his creatinine levels and PH levels were within normal limits. Docket No. 52, ¶ 39. Nurse Practitioner Sandra McArdle explains that there is no test to definitely determine how many pills an inmate has taken, but ingestion of 60

4

Ibuprofen pills would cause creatinine and PH levels to be abnormal. *Id.*; *see also* Docket No. 54, ¶ 5. McArdle further explains that ingesting 60 Ibuprofen pills would have resulted in symptoms of epigastric distress, gastrointestinal bleeding, nausea/vomiting, and rectal bleeding. Docket No. 54, ¶ 5. Plaintiff's levels all were within normal limits and he did not have any of the symptoms described above. *Id.*, ¶ 6. At around 3:00 a.m. (about 4 hours after he had arrived at the hospital), hospital staff authorized plaintiff's release. Docket No. 52, ¶ 41.

According to Feran, at the time of discharge from the hospital, plaintiff acted as though he was losing consciousness. *Id.*, ¶ 42. Hospital records also made note of this. *See* Docket No. 55-1 at 16. A nurse at the hospital checked plaintiff's vitals again and cleared him for release. Docket No. *52*, ¶ 43. Plaintiff continued to act as though he was losing consciousness, which caused Feran and the other two officers to escort plaintiff to the transportation van in a wheelchair. *Id.*, ¶ 44. Plaintiff attempted to slide off the wheelchair several times during the journey. *Id.*, ¶ 45. Once the officers loaded plaintiff in the transportation van and put his seatbelt on, plaintiff began talking normally with staff. *Id.*, ¶ 46.

A few moments later, while the van was still in the parking lot, plaintiff took his seatbelt off and laid down in the back seat. *Id.*, ¶ 48. One of the officers ordered plaintiff to sit back up and put his seatbelt on; plaintiff told him to go fuck himself. *Id.*, ¶ 49. Plaintiff then started kicking the driver side rear window with both feet. *Id.*, ¶ 50. Feran got out of the van and opened the door to get plaintiff to stop kicking. *Id.*, ¶ 51. Plaintiff then tried kicking Feran. *Id.*, ¶ 52. Feran told plaintiff that he would use his Mark 4 Foam if plaintiff kept being combative and plaintiff continued to try to kick Fern. *Id.*, ¶¶ 53-55. Plaintiff does

not dispute that he was kicking or screaming obscenities but he notes that he was in full restraints, and alone in the back seat, so could not have reasonably been perceived to pose a physical threat. See Docket No. 36 at 5 and 12.

Feran used a one second application of the Mark 4 Foam in the target area above plaintiff's eyes. Docket No. 52, ¶¶ 56-57. One of the officers pulled out his Taser and told plaintiff that he would use the Taser if plaintiff did not stop resisting. *Id.*, ¶ 59. A Boscobel police officer also pulled out his Taser and pointed it at plaintiff. *Id.*, ¶ 61. Plaintiff finally stopped resisting when he was faced with two officers pointing their Tasers at him. *Id.*, ¶ 62. The officers put plaintiff's seatbelt back on and they took him back to the institution. *Id.*, ¶¶ 63-64.

Once at the institution, plaintiff showered, was given a conduct report for the incident, and was placed in Clinical Observation. *Id.*, ¶¶ 65-67. Ordinarily, PSU or HSU staff must authorize an inmate's placement in clinical observation, but because it was third shift (around 3 a.m.), PSU and HSU staff were not on-site and plaintiff was placed in Clinical Observation without authorization. *Id.*, ¶ 69.

The next morning, on March 9, 2016, the Security Supervisor called Hoem and told her what happened the night before, including that plaintiff had stated that he wanted to go to Clinical Observation, he alleged to have taken 60 Ibuprofen pills, and he had tried to make a noose. *Id.*, ¶ 71. Hoem approved plaintiff's placement in Clinical Observation, and only allowed certain property in plaintiff's cell including a segregation smock, security mattress, toilet paper, and Styrofoam trays. *Id.*, ¶¶ 70, 72. At that time, plaintiff did not receive a security blanket because he had attempted to create a noose out of a bedsheet the night before. *Id.*, ¶¶ 89, 92-93.

Later that morning, plaintiff told Wallace that he had overdosed the night before and was throwing up and having uncontrollable bowel movements. *Id.*, ¶ 73; *see also* Docket No. 36 at 6, ¶¶ 16, 18. Wallace called the nurse's station but no nurse was immediately available; Wallace told plaintiff to "be patient" and wait until someone was available. Docket No. 52, ¶¶ 74-75; *see also* Docket No. 36 at 6, ¶¶ 18. Correctional staff continued to monitor plaintiff every fifteen minutes through the large observation cell windows until PSU staff could evaluate plaintiff. *Id.*, ¶¶ 77-80. Plaintiff states that everyone could see the vomit and bowel movements in this cell through the observation windows, *see* Docket No. 36 at 6, ¶¶ 19-20, but none of the "observation logs" note that the cell was dirty or that plaintiff had vomited. Docket No. 52, ¶ 81; *see also* Docket No. 60-1

At around 1:05 p.m. that day, Lemieux evaluated plaintiff. Docket No. 52, ¶ 83. According to her notes, plaintiff accused her of lying about being a licensed member of the PSU staff and he screamed obscenities at her. *Id.* Lemieux asked plaintiff to tell her what happened the night before. *Id.* Plaintiff first stated that nothing had happened the night before and then stated that staff had made him do what he did. *Id.* According to Lemieux, plaintiff did not complain about a dirty cell, lack of eating utensils, or any medical issues*. Id.*, ¶¶ 84-88. Plaintiff, on the other hand, states that Lemieux should have seen the conditions given that she came to his cell. Docket No. 36 at 7, ¶ 20. Lemieux could not determine his risk level for self-harm because plaintiff was uncooperative and refused to answer her questions. Docket No. 52, ¶ 90. As a result, she did not authorize a security blanket at that time. *Id.*, ¶¶ 89-90. One other PSU staff member evaluated plaintiff that day. At around 8:30 p.m., plaintiff finally calmed down enough to receive a security blanket. Docket No. 52, ¶¶ 91-93.

The next day, at about 1:30 p.m., Hoem evaluated plaintiff. *Id.*, ¶ 94. Plaintiff had calmed down and denied any thoughts of self-harm. *Id.*, ¶¶ 97-98. Plaintiff did not complain about unsanitary conditions in this cell, nor did Hoem observe unsanitary conditions. *Id.*, ¶ 99. Again, plaintiff states that Hoem should have seen the conditions given that she came to his cell. Docket No. 36 at 7, ¶ 20. Hoem then approved his release from clinical observation. *Id.*, ¶ 100.

**b. Discussion**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(c); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). The movant bears the burden of establishing that there are no genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court grants summary judgment when no reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

1. Deliberate Indifference to a Serious Medical Need

"Prison officials violate the Eighth Amendment. . . when their conduct demonstrates 'deliberate indifference to serious medical needs of prisoners.'" *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997). Deliberate indifference contains both an objective element and a subjective element *Id.*

Under the objective element, the plaintiff must show that his medical condition was sufficiently serious. *Id.* at 1373. A medical condition is sufficiently serious if it has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person

would easily recognize the necessity for a doctor's attention. *Id.* "A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)(quoting *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)). Suicide, attempted suicide, and other acts of self-harm poses a "serious" risk to an inmate's health and safety. *See Collins v. Seeman,* 462 F.3d 757, 760 (7th Cir. 2006) (citing *Sanville v. McCaughtry,* 266 F.3d 724, 733 (7th Cir. 2001)).

Under the subjective element, the plaintiff must show that the officials acted with a sufficiently culpable state of mind*. See Farmer v. Brennan*, 511 U.S. 825, 847 (1994). A prison official must have actual knowledge of the inmate's serious medical condition and either act or fail to act in disregard of that risk. *Roe*, 631 F.3d at 857. A defendant who has subjective knowledge of suicide need not "take perfect action or even reasonable action[.]" *Collins,* 462 F.3d at 762 (quoting *Cavalieri v. Shepard,* 321 F.3d 616, 622 (7th Cir. 2003)). Liability for deliberate indifference "requires more than negligence, gross negligence or even recklessness; rather, it is satisfied only by conduct that approaches intentional wrongdoing, *i.e.,* 'something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Goodvine v. Ankarlo*, 9 F. Supp. 3d 899, 934 (W.D. Wis. 2014)(quoting *Farmer,* 511 U.S. at 835).

### a. Defendant Suthers

Plaintiff's main gripe against Suthers is that "Suthers could have prevented [his] attempted overdose by following protocol." Docket No. 36 at 11. Plaintiff states that, on March 8, 2016, he "held up medications in [his] possession and warned Sgt. Suthers of [his] willingness to take all the medication in [his] possession should [Suthers] fail to follow

protocol and contact the shift supervisor." *Id.* at 3. Plaintiff states he gave Suthers "ample amount of time" to resolve the issue and he took the medication when Suthers "ignored" him. *Id.*

As a preliminary matter, plaintiff does not have a constitutional right to "insist[] that the prison staff accede to his demands…or he would harm himself." *See also Bowers v. Pollard*, 602 F. Supp. 2d 977, 993 (E.D. Wis.), aff'd, 345 F. App'x 191 (7th Cir. 2009). Plaintiff explains that Suthers' description of events is completely unreliable, *see* docket no. 35 at 8-10, but plaintiff's own description of the event suggests that he was not actually suicidal. Instead, based on his own description of the interaction, plaintiff appears to have used his mental health as leverage to make demands upon Suthers.

That aside, McArdle explains that ingestion of 60 Ibuprofen pills would cause an inmate's creatinine and PH levels to be abnormal. She explains that ingesting 60 Ibuprofen would have resulted in symptoms of epigastric distress, gastrointestinal bleeding, nausea/vomiting, and rectal bleeding. *Id.* Plaintiff's creatinine and PH levels all were within normal limits in the hours following his alleged overdose and he did not have any of the symptoms described above. Based on this evidence, McArdle explains that plaintiff did not actually consume 60 ibuprofen pills like he said he did, and therefore, he was not actually at risk of serious harm. *See Davis v. Gee*, 2017 WL 2880869, at *6 (W.D. Wis. July 6, 2017) (dismissing a case at summary judgment because plaintiff "took a non-toxic amount of Tylenol" and therefore did not suffer any objective risk of serious harm).

In any event, even if plaintiff did consume the pills, no reasonable jury could conclude that Suthers showed deliberate indifference towards plaintiff's alleged suicide attempt. After Suthers spoke to plaintiff over the intercom, he called the Captain, the

Control Center, and two officers who were already on Alpha Unit. All of these individuals arrived at plaintiff's cell to assist. Although plaintiff claims that Suthers delayed making the calls, plaintiff was at the hospital giving a urine sample within one hour of his call to Suthers. Based on this evidence, no reasonable jury could conclude that Suthers showed deliberate indifference towards plaintiff's alleged suicide attempt.

      b. Defendant Wallace

Plaintiff explains that Wallace "failed to properly inform WSPF medical staff of [his] urgent needed medical treatment on March 9, 2018." Docket No. 36 at 15. He states that Wallace did not convey the gravity of his medical condition, because had Wallace done so, a nurse would have arrived immediately. *Id.* at 16.

The ICE notes show that Wallace called HSU at around 7:52 a.m. and reported plaintiff's medical condition, including that he had vomited. *See* Docket No. 1-1 at 10-11. There was only one nurse working that shift and she was not immediately available at that time. *Id.* at 10. Wallace had no control over whether a nurse was available when he called. Further, plaintiff has no way of knowing what Wallace did or did not say to HSU. Wallace placed a call to HSU and stated, at a minimum, that plaintiff was vomiting. That is enough to show that Wallace was not deliberately indifferent towards plaintiff's medial needs.

Plaintiff also mentions that Wallace did not move him to a clean cell after he had vomited and had uncontrollable bowl movements. Docket No. 36 at 16. Plaintiff did not allege a claim against Wallace based on this conduct in the complaint, and he was not allowed to proceed with such a claim at screening. Therefore, I will not address it here.

2. Conditions of Confinement

To prevail on his conditions of confinement claim, plaintiff must show that the conditions imposed in Clinical Observation denied him "the minimal civilized measure of life's necessities." *Gillis v. Litscher*, 468 F.3d 488, 491 (7th Cir. 2006). To defeat summary judgment, plaintiff must show that a factfinder reasonably could conclude that the conditions "exceeded mere discomfort and were constitutionally unacceptable." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017).

Plaintiff states that "Dr. Stacy Hoem and Maria Lemieux knew of [his] living conditions on observation" and they allowed him to remain in those conditions between March 9, 2016 and March 10, 2016. Docket No. 36 at 18. Specifically, plaintiff states that he "explained to both" that he did not have access to toilet paper, soap, and a washcloth even though he had vomited and had bowel movements. *Id.* at 7, 18.

The record shows that the first time Hoem interacted with plaintiff was on March 10, 2016, at which time she released him from observation. Based on this, no reasonable jury could conclude that Hoem knew of and/or disregarded plaintiff's complaints about unsanitary conditions of confinement and disregarded the complaint.

Plaintiff and Lemieux appear to dispute whether plaintiff told her about the conditions in Clinical Observation, but the Seventh Circuit has held that prison guards are not deliberately indifferent when they provide an inmate with hygiene materials within twenty-four hours of a request. *See Lunsford v. Bennett*, 17 F.3d 1574, 1580 (7th Cir. 1994). In this case, plaintiff was actually released from Clinical Observation after 24 hours. While plaintiff's experience in Clinical Observation may have been unpleasant, it was far shorter than what is typically required to prevail on an Eighth Amendment

conditions of confinement claim. *See Vinning-El v. Long*, 482 F.3d 923, 924 (7th Cir. 2007). Based on the record, plaintiff cannot show that his confinement in Clinical Observation for 24 hours without hygiene items was constitutionally unacceptable.

     3. Excessive Force/Qualified Immunity

Federal courts engage in a two-pronged analysis when determining whether a prison official violated an inmate's Eighth Amendment right to be free from cruel and unusual punishment. *Hudson v. McMillian,* 503 U.S. 1, 8 (1992). First, the court determines whether defendant's conduct was "harmful enough" under the "contemporary standards of decency." *Id*. Second, the court determines whether defendant acted with a "sufficiently culpable state of mind." *Id.* In a prisoner excessive force claim, the two questions collapse into one: "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 7. "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated." *Thomas v. Stalter*, 20 F.3d 298, 301 (7th Cir. 1994). "Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." *Hudson*, 503 U.S. at 9.

The court considers the following factors when determining whether force used was excessive: "the need for the application of the force, the amount of force applied, the threat an officer reasonably perceived, the effort made to temper the severity of the force used, and the extent of the injury that force caused to an inmate." *Whitley v. Albers*, 475 U.S. 312, 321 (1986). "Unless it appears that the evidence, viewed in the light most

favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard [] described, the case should not go to the jury." *Id.* at 322.

Plaintiff states that Feran "abruptly hop-out of the security van[,] snatched open the passenger side door on the driver side[,] [and] sprayed [him] with chemical gas." Docket No. 36 at 5. Plaintiff states that he was "sitting inside a security van in full restraints confined alone" and there would have been no reason for Feran to use a chemical gas on him. *Id.* at 12. Notably, plaintiff does not dispute Feran's description of his behavior, i.e., that plaintiff was kicking the van door and disobeying orders to calm down. Plaintiff may have been fully restrained while he was kicking and screaming but that does not mean that Feran did not have an interest in restoring order. Further, Feran used a one-second spray of the substance, and Feran (and several other officers) had already given plaintiff many warnings that they would use the spray and/or a Taser if plaintiff did not calm down. Based on the evidence on the record, no reasonable jury could conclude that Feran used the Mark 4 Foam maliciously and sadistically to cause plaintiff pain.

Plaintiff also appears to assert that use of a "chemical gas" is always inappropriate on an inmate who recently overdosed and already has a lot of drugs in his body. Docket No. 36 at 14. Apart from the fact that plaintiff has no medical evidence to support this assertion, defendant would be entitled to qualified immunity on that claim. The doctrine of qualified immunity protects government officials from civil liability when they perform discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A right is clearly established when its contours are "sufficiently clear that every reasonable official would have understood that what he

is doing violates that right." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (internal quotation marks and alterations omitted). Here, plaintiff hasn't established that Feran's decision to use the chemical agent on an overdose patient violated a clearly established constitutional right. Therefore, I will grant defendants' motion for summary judgment and will dismiss this case.

## II. CONCLUSION

For the reasons discussed above, **IT IS ORDERED** that plaintiff's motion for partial summary judgment (Docket No. 36) is **DENIED**, defendants' motion for summary judgment (Docket No. 49) is **GRANTED**. The Clerk of Court shall enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. I may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A).

Under certain circumstances, a party may ask me to alter or amend my judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. I cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. I cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2).

I expect parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin, this 5th day of September, 2018.

s/Lynn Adelman
LYNN ADELMAN
District Judge